THE FOLLOWING ORDER
IS APPROVED AND ENTERED
AS THE ORDER OF THIS COURT:



DATED: December 27, 2017

Beth E. Hanan
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

      Green Box NA Green Bay, LLC,      Case No. 16-24179-beh

                  Debtor.            Chapter 11

**OPINION AND ORDER GRANTING ABILITY INSURANCE COMPANY'S
MOTION TO DISMISS THIS CASE**

The debtor, Green Box NA Green Bay LLC, has been dogged by the long
shadow of its former managing member, Ronald Van Den Heuvel.

A year after declining the U.S. Trustee's request to dismiss this case, a
request largely based on structural and documentation problems attributable
to Van Den Heuvel, the court is faced once again with calls to dismiss or
convert this Chapter 11 proceeding. The debtor and its largest creditor, Ability
Insurance Company, now agree there is cause to dismiss, but one creditor,
Wisconsin Economic Development Corporation ("WEDC"), argues that
conversion to chapter 7 is the best alternative for creditors. WEDC views
chapter 7 as a new means to investigate whether the debtor has any

unencumbered, as-yet-undiscovered assets that may be used to benefit creditors.

Based on the evidence filed in support of the requests to dismiss or convert, as well as the record in this case, I conclude that there is cause to dismiss this case, and dismissal, not conversion, is in the best interest of creditors and the estate. The following constitutes the court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052 (incorporating FED. R. CIV. P. 52(a)).

## FACTUAL BACKGROUND

The chronology of efforts to fully identify and trace the assets of the debtor spans several years and multiple authorities. One source describes that around 2010, Van Den Heuvel began promoting a "Green Box" business plan for use in different municipalities, to obtain funds to purchase equipment and facilities necessary to use proprietary processes that could convert solid waste into consumer products and energy, without any wastewater discharge or landfilling of byproducts. *See* CM-ECF, Doc. No. 330-1, at 2. A federal grand jury has recently charged that Van Den Heuvel formed and controlled numerous business entities he used interchangeably for business and personal purposes. *Id.* Among them, the debtor, Green Box NA Green Bay LLC, was formed to pursue the Green Box business plan in De Pere, Wisconsin. Similarly, Green Box NA Detroit LLC, was formed to pursue a Green Box operation in Detroit, Michigan that would sort waste and create fuel products. *Id.*, at 2–3.

Another description of the debtor, filed specifically for this case, is that as originally structured by Van Den Heuvel, Green Box NA Green Bay LLC owned a paper conversion facility in De Pere, Wisconsin; another entity, Eco-Hub, LLC, rented the paper conversion facility to convert bulk paper rolls into consumer paper products; and a third entity, Patriot Tissue, LLC, sold those paper products to consumers. *See* CM-ECF, Doc. No. 59, at 2. The debtor also owns or has an interest in two thermal degradation devices ("Kool Units"). The debtor is a member of a joint venture, PC-ARM, LLC, which owns one of the two Kool Units. *Id.*, at 3. Van Den Heuvel also envisioned that while the debtor would be the operating company (in Green Bay), a fifth entity, EARTH, would hold many of the (hard) assets, and the necessary intellectual property would be licensed by or owned by a sixth entity, PC Fibre Technology, LLC. CM-ECF Doc. No. 182, at 8.

In support of the instant motion to convert, WEDC has submitted a "summary balance sheet" as of June 30, 2014, showing the debtor's "total current assets" of $4.8 million, "total property, plant and equipment" of almost $67 million, and "total patents and intellectual property" of over $111 million. The same summary balance sheet included a category of "subholding groups assigned assets," with a total value of over $94 million. Liabilities included Van Den Heuvel debt of over $110 million. CM-ECF, Doc. No. 345, at 4–5. WEDC also submitted a "summary balance sheet" for Patriot Tissue, LLC, as of December 31, 2014. The debtor apparently provided both sheets to WEDC in

late 2014 or early 2015, as support for a loan WEDC made in 2011 and a later, smaller grant.

In March, 2015, Ability Insurance Company, the mortgage holder for the debtor's main building in De Pere, began a foreclosure action in Brown County Circuit Court. *See* CM-ECF, Doc. No. 182, at 9.

Shortly thereafter, in May, 2015, the debtor's creditors forced it into receivership in state court. CM-ECF, Doc. No. 9-2. As part of that proceeding, the state court ordered the debtor to file a list of its assets and liabilities, and turn over its books and records. *Id.* The Brown County Sheriff executed a search warrant on the debtor's offices and those of other Van Den Heuvel entities, and took possession of 38 file cabinets, all computers, laptops, and servers, as well as written records from the Van Den Heuvel home. CM-ECF, Doc. No. 182, at 9–10. Creditors examined Van Den Heuvel under oath in their attempt to locate assets, although he invoked the Fifth Amendment in response to the majority of questions. CM-ECF, Doc. No. 346-2.

In late 2015, the state court held both the debtor and Van Den Heuvel in civil contempt for failing to file an accurate list of assets and liabilities, to turn over all of its books and records, and for transferring, encumbering or otherwise disposing of assets of the debtor's receivership estate. CM-ECF, Doc. No. 9-6. The Brown County Circuit Court also issued a writ of bodily attachment for Van Den Heuvel. CM-ECF, Doc. No. 9-8. During this time, the debtor did not operate as a paper converter, as the receiver had dismissed its

employees. Some of those persons then went to work for related entities. CM-ECF, Doc. No. 182, at 10.

In April, 2016, Van Den Heuvel was indicted for bank fraud.[1] Investors forced him to resign his position with the debtor. CM-ECF, Doc. No. 182, at 12. Under new managing member Stephen Smith, the debtor pursued its Chapter 11 bankruptcy case, beginning in late April, 2016. At least as of the time this case was filed, none of the debtor's assets were free from encumbrance. CM-ECF, Doc. No. 59, at 3, 9. The goal of the Chapter 11 case was to effectuate a "roll-up," in which a new entity, NewCo, would acquire the assets of the debtor and other related entities. NewCo would operate a waste reclamation and recycling business, projected to produce income sufficient to pay off unsecured claims in full, within 60 months of the effective date of the plan. The plan provided that secured claims would be paid at the time of the roll-up, and were to be funded by financing raised in the capital markets by an investment bank. Much of the byzantine structure of the multiple entities would be collapsed, and the environmentally-friendly technology finally would bear fruit. Smith, the new managing member, and investor in the debtor through his LLC Glen Arbor, testified that he had invested over $7 million in the company. CM-ECF, Doc. No. 44, hearing testimony; *see also* CM-ECF, Doc. No. 182, at 12.

---

[1] A grand jury in the Eastern District of Wisconsin filed a superseding indictment on September 20, 2016. That indictment charged Van Den Heuvel, along with two other persons, with bank fraud activity conducted between January 2008 through September 2009. *See* CM-ECF, Doc. No. 121-3. Van Den Heuvel did not form Green Box NA Green Bay LLC until 2011. *See* CM-ECF Doc. No. 182, at 5.

In the U.S. Trustee's August, 2016 motion to dismiss, which was joined by creditors Ability, Cliffton Equities and WEDC, the movants argued that the debtor had failed to meet its duty under the Bankruptcy Code to file complete schedules and a statement of financial affairs. *See* CM-ECF, Doc No. 59, at 10 *et seq.* But in denying the motion to dismiss, the court considered that some information remained in the hands of the Brown County Sheriff as of the third quarter 2016, and that the debtor's CFO, Mr. Kolasinski, had testified that he continued to research and review information as it was returned, and that some amendments already had been filed. *See* CM-ECF, Doc. No. 92, at 29–30; Doc. No. 78; Doc. Nos. 86 and 87 (audio of September 30, 2016 hearing); *see also* CM-ECF, Doc. No. 182, at 14, 16 (noting return of 38 file cabinets and 21 pallets of banker boxes of records; PriceWaterhouseCoopers to reconstruct the books and records and compile the tax returns for 2013, 2014 and 2015).

Going forward, after multiple evidentiary hearings and numerous negotiations with its creditors and the SEC, the debtor achieved approval of its Chapter 11 plan in February, 2017. But outside the bankruptcy case, investigation of Van Den Heuvel continued.

As noted in a November 16, 2016 filing by the Securities and Exchange Commission:

> the SEC is currently investigating whether Ronald Van Den Heuvel, entities he founded or operated, or their officers, directors, owners, or employees, violated the antifraud provisions of the federal securities law. The Commission is examining . . . whether Van Den Heuvel or others, including RTS and GBGB (the debtor),

> made misrepresentations to investors in the course of securities offerings, and whether money raised through offerings was misused. Part of this inquiry focuses on whether Van Den Heuvel and his companies, including RTS (Reclamation Technology Systems, LLC, aka EARTH) and GBGB, followed corporate formalities, or if they commingled the assets and liabilities of the various entities.

CM-ECF, Doc. No. 119, at 3. The SEC was investigating activities as far back as 2012. *Id.* The third amended plan, as approved in early 2017, therefore included carve out language required by the Securities and Exchange Commission. CM-ECF, Doc. No. 223, at 23.

On September 19, 2017, a second federal grand jury issued an indictment against Van Den Heuvel concerning his activities between March, 2011 and at least August 2015. These alleged activities, unlike those that were the subject of the first indictment, directly related to Van Den Heuvel's use of multiple entities including the debtor, in the paper reclamation business. *See* CM-ECF, Doc. No. 330-1. The indictment alleges, among other things, that Van Den Heuvel represented to investors and lenders, including WEDC, "false financial statements that grossly inflated . . . his companies' assets, including its intellectual property"; "falsely represented that particular business entities had title and control of property where Green Box operations would occur when, in fact, those entities lacked title and control of the property;" and "provided security interests in the same equipment to multiple investors and lenders misleading them about the existence and value of their security interests."

The second indictment further alleges that Van Den Heuvel diverted significant portions of the funds he solicited from investors and lenders away from purposes advancing the Green Box business plan, and into other uses, including converting a large amount of the funds to cash, and to pay personal expenses, creditors and legal obligations unrelated to the Green Box business plan. CM-ECF, Doc. No. 330-1, at 4. Paragraphs 8(a) through 8(i) specifically allege how in 2011 Van Den Heuvel made false representations to WEDC about his business entities, presented a worthless mortgage, concealed his misuse and diversion of most of WEDC loan funds, and supplied fraudulent records of employee training in order to obtain WEDC grant funds. CM-ECF, Doc. No. 330-1, at 7–8. The indictment seeks a forfeiture of any real or personal property derived from the offenses of conviction. *Id.* at 17.

On October 4, 2017, Van Den Heuvel entered into a plea agreement with the government regarding the first indictment (for his activities pre-dating the debtor's formation). *See* CM-ECF, Doc. No. 346-5, at 1–18. As part of the plea, Van Den Heuvel agreed that between 2008 and 2009 he operated and controlled at least seven purported business entities that he used interchangeably. A predominant share of the money from loans he obtained was disbursed for his own purposes and for his business entities, and with one exception, the loans were not repaid. The collateral pledged for these loans belonged to Van Den Heuvel himself, and not to separate entities.

While these SEC and U.S. Attorney investigations of Van Den Heuvel and his current or former entities progressed, the debtor tried to fulfill its

obligations under the confirmed plan. *See* CM-ECF, Doc. No. 223. Difficulties soon arose. The confirmed plan had an effective date of March 31, 2017. On April 20, 2017, Ability filed a renewed motion for relief from the stay and for release of tax escrow funds, because the planned roll-up had not occurred. CM-ECF, Doc. Nos. 234, 235. The debtor acknowledged that its problems in raising funds to complete due diligence as prelude to the investment firm bringing the project to market sprung from the negative publicity surrounding the Van Den Heuvel investigation(s). CM-ECF, Doc. No. 241. Recognizing those hurdles, but believing that other components to reach the goal were in place, including another $1 million contributed by Smith via Glen Arbor, the debtor moved to extend the plan's effective date to September 30, 2017. With WEDC as the only objector, and after a hearing, the court approved the modification. *See* CM-ECF, Doc. No. 294. In the meantime, WEDC continued its own investigative efforts, obtaining court approval for a Rule 2004 exam of the debtor, and then a subpoena for exam and documents of creditor Little Rapids Corporation. *See* CM-ECF, Doc. Nos. 239, 280. The latter underscored WEDC's concern that equipment it believed had secured its 2011 loan to the debtor was actually part of the security for other debt, and in fact had been abandoned by the estate. *See* CM-ECF, Doc. No. 281 (Little Rapids Corporation's Motion to Quash).

The debtor's struggles to achieve the plan's stated goals and the outside investigations of Van Den Heuvel essentially merged in early October, 2017. On the day before Van Den Heuvel executed his plea agreement to the first

indictment, Ability filed a motion to dismiss or for relief from stay in the bankruptcy case, alerting the court to the fact that the roll-up had not occurred by September 30.  CM-ECF, Doc. No. 301.[2]  Creditor Paper Holdco also moved to dismiss.  CM-ECF, Doc. No. 306.  Conceding that dismissal was in the best interest of creditors, the debtor consented to dismissal.  CM-ECF, Doc. No. 317.  Only WEDC objected to the motions to dismiss.  WEDC agreed that "cause" existed, but argued that conversion, rather than dismissal, was in the best interest of creditors and the estate.  CM-ECF, Doc. No. 330.  Paper Holdco subsequently filed a "reply," changing its position to seek conversion rather than dismissal, but without analysis.  CM-ECF, Doc. No. 335.[3]

At the preliminary hearing on the motions to dismiss, the court expressed doubt that conversion would provide any benefit to creditors, based on the apparent lack of assets available for a chapter 7 trustee to liquidate, despite investigations by outside agencies.  Counsel for WEDC suggested that fraudulent transfers or preferences may exist, which a chapter 7 trustee could investigate.  After obtaining consent from the movants to continue this matter past the 15-day deadline in which the court ordinarily must issue a decision on a motion to dismiss, *see* 11 U.S.C. section 1112(b)(3), the court set a briefing

[2]  Although the court ultimately granted Ability's request for relief from stay, Ability has maintained its request for dismissal in light of WEDC's request for conversion, as noted below, and therefore the court considers its motion for dismissal still pending before the court.

[3]  Paper Holdco ultimately withdrew both its original motion and its reply, declining to brief either request.

schedule to allow WEDC to provide additional legal and factual support for its conversion argument.[4]

WEDC asserts that three reasons warrant conversion: (1) the debtor's disclosures in this case omit interests or assets that were included in various documents that WEDC received from the debtor in 2014 or 2015; (2) the debtor was undercapitalized and its assets were comingled with assets of related entities; and (3) the debtor's former management was engaged in criminal activity, while its current management lacks information or records, and also presents a conflict of interest. The thrust of WEDC's argument is that a chapter 7 trustee may discover fraudulent transfers or "hidden assets" that can be administered for the benefit of unsecured creditors.

In response, the debtor argues that the evidence WEDC relies on is old and of questionable reliability; that there is no legal or factual basis to conclude that the property of allegedly related entities would be property of a converted estate; and that conversion would be a waste of time and resources given the history of this case and the state court receivership.

Ability likewise asserts that an investigation for assets in a converted chapter 7 case would be a "wild goose chase," and challenges the sufficiency of WEDC's evidence to establish the existence of *specific* assets available for a

---

[4] Section 1112(b)(3) requires a decision on a motion to dismiss or convert within 15 days of the commencement of the hearing on the motion, unless the movant consents to a continuance for a specific period of time. Fifteen days after briefing concluded was December 26, 2017, but the District Court and the Bankruptcy Court for the Eastern District of Wisconsin were both closed. The court therefore issues this decision on the next business day.

chapter 7 trustee to liquidate. Ability also points out that, following a dismissal, WEDC would be free to pursue its own investigation under state law.

## DISCUSSION

Under section 1112(b)(1), a court shall dismiss or convert a case to chapter 7, whichever is in the best interests of creditors and the estate, for cause. Section 1112(b)(4) contains a non-exhaustive list of grounds that constitute cause, which includes "inability to effectuate substantial consummation of a confirmed plan," and "material default by the debtor with respect to a confirmed plan." 11 U.S.C. § 1112(b)(4)(M), (N). What constitutes "cause" is a matter of judicial discretion. *In re Jartran, Inc.*, 71 B.R. 938, 943 (Bankr. N.D. Ill. 1987), *aff'd,* 886 F.2d 859 (7th Cir. 1989).

No one disputes that the debtor's inability to effectuate the roll-up by September 30 constitutes "cause." And neither the debtor nor any other interested party has argued or demonstrated that there are unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, *see* 11 U.S.C. § 1112(b)(2). So, the issue before the court is whether dismissal or conversion is the appropriate remedy.

In deciding between dismissal or conversion, courts have considered the following factors:

    (1)   whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal,

    (2)   whether there would be a loss of rights granted in the case if it were dismissed rather than converted,

(3)   whether the debtor would simply file a further case upon dismissal,

(4)   the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors,

(5)   in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise,

(6)   whether any remaining issues would be better resolved outside the bankruptcy forum,

(7)   whether the estate consists of a "single asset,"

(8)   whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests,

(9)   whether a plan has been confirmed and whether any property remains in the estate to be administered, and

(10)  whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns.

*In re Helmers*, 361 B.R. 190, 197 (Bankr. D. Kan. 2007) (citing Alan N. Resnick and Henry J. Sommer (Co–Editors), 7 Collier on Bankruptcy, ¶ 1112.04[6] (15th ed. rev. 2005)).

Many of these factors appear inapplicable or neutral here. For example, there is no evidence that creditors received preferential payments (factor 1), that the debtor would re-file for bankruptcy (factor 3), that the debtor engaged in misconduct during this case (factor 8), or that this case involves environmental or safety concerns (factor 10). It is undisputed that, despite the efforts of Smith, Kolasinski, and others, there is no economic enterprise to maximize (factor 5).

Essentially, the above factors help the court compare how creditors would fare inside, as opposed to outside, bankruptcy. *In re Helmers*, 361 B.R. at 197. So, a key question the court must ask is: what assets would be

available for a chapter 7 trustee to liquidate and administer for the benefit of unsecured creditors if this case were converted? *See, e.g.*, factors 4 and 9. WEDC argues that the debtor's assets did not vest in the debtor upon confirmation of the plan, *see* 11 U.S.C. § 1141(b), because the plan provided otherwise. *See* CM-ECF, Doc. No. 352, at 2; Doc. No. 223, at 22 ("The Debtor shall continue to be the Debtor in Possession and the bankruptcy estate shall remain in existence and hold all of its assets until all of said assets have been administered and the proceeds distributed in accordance with the terms of this Plan.").[5] As a result, WEDC asserts, the assets of the chapter 11 estate would become property of the chapter 7 estate upon conversion.

Even assuming WEDC's argument to be true, the debtor has no unencumbered liquid assets to fund a chapter 7 administration. *See, e.g.*, CM-ECF, Doc. No. 59, at 12 (U.S. Trustee's assertion that the estate is administratively insolvent); Doc. No. 182, at 57–58 (debtor's liquidation analysis); Doc. No. 14, at 3–15 (debtor's schedules A-D); Doc. No. 255 (debtor unsuccessful in getting packet to investment banker); and Doc. No. 289 (debtor's June 2017 monthly operating report). WEDC has not identified any such assets in its briefing and supporting affidavits. As a result, upon

---

[5] WEDC argues in the alternative that the plan as a practical matter compels retention of property by the estate, citing *In re Hughes*, 279 B.R. 826 (Bankr. S.D. Ill. 2002). In *Hughes*, the bankruptcy court concluded that confirmation of the individual debtor's plan was ineffective to create a valid contract because the premise on which confirmation was based— confirmation of the plan of reorganization of the debtor's related businesses—never came into being. WEDC likens the failure of the roll-up here as the failure of a condition precedent to the reorganization contract. But the terms of the debtor's plan in this case expressly provided for certain remedies if the roll-up was not successful. The court cannot conclude that the failure of the roll-up here rendered the contract unenforceable.

conversion of this case, there appears to be nothing for a chapter 7 trustee to administer for the benefit of unsecured creditors.

Apparently recognizing the debtor's current insolvency, WEDC argues that conversion is warranted because a chapter 7 trustee may be able to discover fraudulent conveyances or hidden assets of the debtor. While it is true that conversion may be in the best interest of creditors if there is a preference or fraudulent conveyance that a chapter 7 trustee can recover, *see, e.g.*, *In re T.S.P. Indus., Inc.*, 117 B.R. 375, 378 (Bankr. N.D. Ill. 1990), a motion to convert should not be "used as a pretext for a fishing expedition, especially when the lake looks so barren. The mere possibility that a claim might be found is not reason enough to convert a case, appoint a trustee and incur administrative expenses that will almost certainly never be paid. That result would not be in the best interests of creditors or the estate." *In re T.S.P. Indus., Inc.*, 120 B.R. 107, 111 (Bankr. N.D. Ill. 1990).[6]

WEDC's insistence on an investigation by a chapter 7 trustee ignores the reality that a chapter 7 trustee faces: funds for an investigation like the one WEDC proposes here—which likely would require the trustee to hire counsel and engage in significant discovery—are derived from the estate. *See, e.g.*, *In re Efoora, Inc.*, 472 B.R. 481, 492 (Bankr. N.D. Ill. 2012) (a chapter 7 trustee has no independent source of money to fund an investigation; "the money comes

---

[6] WEDC cites *In re Sundale, Ltd.*, 471 B.R. 300, 303 (Bankr. S.D. Fla. 2012). While the *Sundale* court considered *T.S.P.* "extreme" in its view that no assets revest when a case is converted to a chapter 7 case postconfirmation, *Sundale* in no way dilutes *T.S.P.*'s practical assessment of speculative bases, and commensurate wasted expense, for conversion over dismissal.

from the estate"). Here, the estate has no funds to pay for such an investigation. And, as noted above, vigorous investigative resources of others have been at work, though so far yielding no fresh assets. The receiver used the resources of the Brown County Circuit Court and Brown County Sheriff. The U.S. Attorney's office has pursued two indictments of Van Den Heuvel, with at least one of these efforts including investigation by the SEC. WEDC urges that the scope of a chapter 7 trustee investigation in 2018 would exceed that conducted by the state court receiver, but overlooks the broad jurisdiction of the SEC, as well as the opportunity each creditor had to conduct Rule 2004 exams. Dismissal, not conversion, would allow the creditors to benefit from already-funded investigations, and leave them free to pursue state law remedies tailored to their own needs and resources. *See, e.g.*, the second indictment's specific allegations regarding the 2011 WEDC loan, and request for forfeiture.

In determining whether to grant WEDC's request for conversion, the court also must examine whether the evidence presented raises more than the mere possibility of a claim (or assets) for a chapter 7 trustee to pursue—and, whether those assets could be liquidated to pay for the chapter 7 trustee's administrative expenses, as well as provide a dividend to unsecured creditors.

WEDC's first argument for conversion is that a chapter 7 trustee should be appointed to investigate additional assets that the debtor purportedly owned in 2014 that have since "disappeared": namely, patents and intellectual property, a "TAK Case," and interests in related companies WFRT, PCDI, and

Patriot Tissue, Inc.  *See* CM-ECF, Doc. No. 344, at 3.  The evidence WEDC

offers to support this argument is a set of three documents—(1) a June 30,

2014 balance sheet for the debtor; (2) a flow chart of the debtor's alleged parent

company, E.A.R.T.H.; and (3) a December 31, 2014 balance sheet for Patriot

Tissue, L.L.C.—that WEDC received from the debtor at some point prior to May

20, 2015.  *See* CM-ECF, Doc. No. 345.

WEDC's reliance on these documents to prove the disappearance of the

debtor's assets is misplaced.  WEDC offers no foundational evidence to explain

who prepared these financial documents or when—and thus whether a chapter

7 trustee should suspect they are accurate.[7]  Moreover, the court is doubtful

that a chapter 7 trustee would be able to liquidate the type of intangible

property that WEDC identifies.  WEDC's exhibits do not allow the court to

conclude that a chapter 7 trustee may be able to find—let alone liquidate—any

of these alleged "missing" assets for the benefit of unsecured creditors.  Despite

the investigations by the state court receiver, the SEC, and the U.S. Attorney's

---

[7]  The supporting affidavit of Brian Nowicki lacks any statements as to how these documents
came to be, what they represent, or the degree of accuracy of the documents at the time they
were created or when the bankruptcy petition was filed.  The "TAK case" does not include the
debtor as a party; the Patriot balance sheet includes a loan of almost $1 million to the debtor,
which is not included on the debtor's balance sheet at the same time.  The flow chart likewise
wholly lacks any foundation, and to say that an unsigned, undated sheet of paper "confirms"
that the debtor owns 60% in PCDI is too strong a verb choice.  *See* CM-ECF, Doc. No. 345, at 7.
The claim of 60% ownership in Patriot Tissue, which purportedly had combined assets of $17
million in 2014, not only lacks any other support to warrant the use of chapter 7 trustee
investigatory resources, but the probability of liquidating this interest for anyone's benefit is
dubious given the testimony that the debtor allowed Patriot Tissue to operate rent-free before
and during this case.  The "patents and intellectual property" of the debtor that WEDC
suggests a chapter 7 trustee may be able to administer appear to be licensed or owned by a
separate entity—not the debtor.  *See* CM-ECF, Doc. No. 182, at 8.  All WEDC has shown is that
some assets were described on paper, and as the debtor obtained its WEDC loan in 2011, there
seems little incentive for accuracy in 2014.

office, creditors like WEDC are in no better position today to confirm or refute asset lists and financial statements Mr. Van Den Heuvel put together before this case was filed. *See, e.g.*, CM-ECF, Doc. No. 92, at 29 (denying the U.S. Trustee's motion to dismiss and noting that "there is no foundation to show that any of the historical financial information of the debtor that Smith previously viewed was accurate").

WEDC's second argument for conversion is that the debtor somehow is entitled to the property of other entities as their "alter ego." WEDC cites February 2016 testimony of Ronald Van Den Huevel in the receivership, as well as an undated equipment list, to suggest that assets of the debtor were comingled with related entities including PCDI, TPTC, and Eco Hub. WEDC asserts that "[w]hether the Debtor is entitled to property of one or more other RVDH-related entities must be examined by a Chapter 7 trustee." But WEDC does not specify what property it believes the chapter 7 trustee could claim on behalf of the debtor; it speculates only that such property may exist based on Mr. Van Den Heuvel's testimony—or lack thereof. WEDC cites *Baxter v. Palmigiano*, 425 U.S. 308 (1976), to claim the benefit of an adverse inference, given Van Den Heuvel's assertion of the Fifth Amendment in his receivership testimony. While a court is free, in a civil case, to draw an adverse inference against a party who asserts the privilege against self-incrimination, bankruptcy courts have held that such an inference does not necessarily relieve a moving party of its burden. *See In re Inflight Newspapers, Inc.*, 423 B.R. 6, 16–18 (Bankr. E.D.N.Y. 2010). Here, where the privilege was invoked on a wide array

of questions concerning multiple entities, the inference cannot be drawn as narrowly as WEDC's motion requires: to show that particular unencumbered assets of this debtor exist which a chapter 7 trustee (unlike the receiver, or U.S. Attorney) would find and recover for the benefit of creditors.

WEDC also fails to address the additional costs that litigating any possible ownership issues would require of a chapter 7 trustee and the estate. And WEDC's reliance on *Consumer's Co-op. of Walworth Cty. v. Olsen*, 142 Wis. 2d 465, 419 N.W.2d 211 (1988), for its "alter ego" argument is misplaced. That case concerned the propriety of "piercing the corporate veil" to impose personal liability on corporate shareholders for a corporate debt—not the circumstances in which the assets of one entity should be considered the property of another. In addition, the very untangling of entities that WEDC seeks appears to be underway via the second indictment. *See* CM-ECF, Doc. No. 330-1. Such information, if gained, can be useful to creditors in state court proceedings.

Finally, WEDC argues that conversion is warranted because of former management's criminal activity and current management's lack of knowledge, and/or conflicts of interest. WEDC notes that there is a lack of information and data relating to the debtor's prepetition activities, and therefore "neither the current attorneys nor management of the Debtor can hardly state with any certainty what exactly the Debtor and/or RVDH did or did not do in the months or years leading up to the filing of this bankruptcy case." According to WEDC, "those transactions are precisely what a Chapter 7 trustee is charged to investigate." WEDC then points out the apparent conflict that arises from the

debtor's current manager, Stephen Smith, being a principal in GlenArbor Capital, a prepetition investor in the debtor. WEDC asserts that it has a right to know what prepetition advice GlenArbor gave to the debtor, and suggests that the debtor may have "claims" against Glen Arbor, which would be assets of the bankruptcy estate.

WEDC's argument regarding a lack of information is not new. WEDC made—and the court discounted—a similar argument in support of the U.S. Trustee's motion to dismiss in October 2016, based in part on WEDC's failure to seek a Rule 2004 examination to obtain additional information from the debtor. *See* CM-ECF, Doc. No. 92, at 25. More fundamentally, WEDC fails to explain how the appointment of a chapter 7 trustee will remedy this persistent, pervasive problem. Conversion of this case will not make the "missing" information appear, nor will it cause Mr. Van Den Heuvel to decide to testify, rather than maintain his Fifth Amendment rights. And WEDC's suggestion that the debtor may have claims against Glen Arbor are unsupported and speculative. While WEDC's burden on this motion is a preponderance of the evidence, its suppositions as to prepetition transactions are only that, suppositions.

As Ability and the debtor both pointed out in their response briefs, long before the debtor filed this bankruptcy case—in May 2015—WEDC and other creditors forced the debtor into a Chapter 128 Receivership. A receiver was appointed to investigate the assets of the debtor. Over the course of 10 months, neither the receiver nor the actively participating creditor group

discovered any hidden assets or fraudulent transfers of the debtor.  And

information was fresher then.  Likewise, during the course of this bankruptcy

case, pending for over 19 months, neither the U.S. Trustee nor any of the

participating creditors have been able to find additional assets of the debtor—

or concrete evidence that such assets exist.  Their frustration is palpable.

Yet none of the facts relied on by WEDC persuade this court that

creditors or the estate would benefit from conversion of this case.  The only

certainty is that conversion would result in increased administrative

expenses—which WEDC has not offered to pay[8]—with little likelihood of

distribution to general unsecured creditors.  As the debtor's counsel points out,

counsel has a significant administrative claim: this court has approved over

$135,000 in attorneys' fees, of which it appears almost $100,000 remains

unpaid.  *See* CM-ECF, Doc. Nos. 230, 288, 289, and 299.  Additionally, the

Department of Workforce Development, the Internal Revenue Service, and the

Wisconsin Department of Revenue have filed priority claims totaling over

$110,000.  Assuming that a chapter 7 trustee could find and liquidate any

property of the debtor (setting aside the costs of any "ownership" litigation

---

[8]  *See, e.g.*, *In re Gannon Int'l, Ltd.*, 528 B.R. 906 (E.D. Mo. 2015) (affirming bankruptcy court's
order dismissing, rather than converting, chapter 11 case, where bankruptcy court considered
the absence of any offers from creditors to pay for a chapter 7 trustee, the inability of the estate
to pay a trustee, and the difficulty and expense in investigating and recovering assets of the
debtor); *cf. In re FRGR Managing Member LLC*, 419 B.R. 576, 585 (Bankr. S.D.N.Y. 2009)
(ordering conversion, in part because one of the creditors supporting conversion agreed to fund
the activities of a chapter 7 trustee up to the amount of $50,000, which would provide "ample
funds to support the efforts of a trustee and the trustee's professionals").

against other entities), these significant claims would be paid before any distribution to general unsecured creditors.

In sum, while the court is sympathetic to the long-standing frustration of WEDC and the other creditors, WEDC cannot meet its burden of proving that conversion, rather than dismissal, is in the best interest of creditors and the estate. The possibility that unencumbered assets of the debtor may be found almost three years after the receivership was begun is not likely or certain enough to justify appointing a chapter 7 trustee and diverting judicial and administrative resources to a case in which there is little to no evidence that any unsecured claims will get paid.

### CONCLUSION

For the foregoing reasons, the court finds that cause exists to dismiss this case, and that dismissal would be in the best interest of creditors and the estate. Accordingly, Ability Insurance Company's motion to dismiss this case is **GRANTED.**

**IT IS SO ORDERED.**

#####